AO 241 (Rev. 5/85)

| Hnited States District Court | District MASSACHUSETTS | |
|---|---|---|
| Name Raymond Cook | Prisoner No. W-64720 | Case No. 35 042 |
| Place of Confinement MCI-Cedar Junction | | |

| Name of Petitioner (include name under which convicted) Raymond Cook | Name of Respondent (authorized person having custody of petitioner) V. David Nolan |
|---|---|

The Attorney General of the State of: Massachusetts

## PETITION

1. Name and location of court which entered the judgment of conviction under attack    Superior Court of New Bedford Massachusetts - Criminal Division

2. Date of judgment of conviction    May 29, 1998

3. Length of sentence    Life

4. Nature of offense involved (all counts)    First Degree Murder




5. What was your plea? (Check one)
   (a) Not guilty        ☒ I asked my Attorney to do only a not guilty plea
   (b) Guilty            ☐ because I am innocent.  He agreed.  But at trial
   (c) Nolo contendere   ☐ he did an insanity defense.

   If you entered a guilty plea to one count or indictment, and not a guilty plea to another count or indictment, give details:




6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury        ☒
   (b) Judge only  ☐

7. Did you testify at the trial?
   Yes ☐        No ☒    But I wanted to testify.

8. Did you appeal from the judgment of conviction?
   Yes ☒        No ☐

(2)

9.  If you did appeal, answer the following:

    (a) Name of court  New Bedford Superior Court, Criminal Division.

    (b) Result  Denied my Rule 30 - Motion for a New Trial after Judge told
        his Clerk he would wait for me to get private investigator/expert.
    (c) Date of result and citation, if known  May 31, 2001, Case No. 35,042

    (d) Grounds raised  Ineffective assistance of counsel; abandoning defendant's not gui-
        lty defense and argued not guilty by reason of insanity after he had agreed to
        only do my only defense of not guilty; defense counsel failed to investigate
                                                            (continued on back of page)
    (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

        (1) Name of court  Supreme Judicial Court of Massachusetts

        (2) Result  Appeal denied


        (3) Date of result and citation, if known   May 27, 2003 - Docket No. SJC-08280

        (4) Grounds raised  Whether the trial court erred in denying the defendant's mot-.

        ion for new trial without a hearing when the record before the trial court re-
        quired the granting of a new trial?            (continued on back of page 4)
    (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each
        direct appeal:

        (1) Name of court  United States Supreme Court

        (2) Result  Petition for a writ of certiorari denied


        (3) Date of result and citation, if known   October 6, 2003 - No. 02-11028

        (4) Grounds raised  Whether either the Due Process clause of the Fourteenth Amend-

        ment or the right to conduct one's own defense as guaranteed by the Sixth
                                                            (continued on back of page)
10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications,
    or motions with respect to this judgment in any court, state or federal?
    Yes ☐        No ☒

11. If your answer to 10 was "yes," give the following information:

    (a) (1) Name of court _____

        (2) Nature of proceeding _____


        (3) Grounds raised _____

AO 241 (Rev. 5/85)

_____

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐          No ☐

(5) Result _____

(6) Date of result _____

(b) As to any second petition, application or motion give the same information:

(1) Name of court _____

(2) Nature of proceeding _____

_____

(3) Grounds raised _____

_____

_____

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐          No ☐

(5) Result _____

(6) Date of result _____

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1) First petition, etc.          Yes ☐          No ☐
(2) Second petition, etc.         Yes ☐          No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting the same.

Caution: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: __Ineffective assistance of Trial Counsel__

_____

Supporting FACTS (state *briefly* without citing cases or law) __Right to a not guilty pleas not__ an insanity defense raised by trial counsel; Right to testify before the 12 jurors and the Court; Right to colloquay as my plea of not guilty and not an insanity defense; Right to have defense attorney, to have defense forensic experts to test false and made-up state forensic evidences; abandoning the defendant's not guilty by reason of insanity constitutes ineffective assistance of counsel; failure to interview and call witnesses who would have impeached the

(continued on back page)

B. Ground two: _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

**12. A. Supporting Facts, continued from back of page 5:**

that I wanted an insanity defense.  They trusted him, and he lied, and misled
them about I wanted an insanity defense.  And he told them what to say at
trial my son Raymond C. Pelote said to me; failure of trial counsel to inter-
view and call available defense witnesses, who were there at crime scene to
impeach state witnesses who lied and framed me and set me up, Trial counsel in
his files I got from him all my letters and legal researches to him, and
another attorney who did an affidavit for me all which said only that I am in-
nocent and I only want an innocent not guilty plea as Attorney Segadelli and I
had agreed; Trial counsel failed to ask Ms. Jean Felix or her daughter who
lived in the second floor apartment on August 24, 1994 could someone else or
other people could have been on the third floor hallway when you and your
daughter came out of the second floor and went downstairs to Mr. Cook's 1st
floor apartment?; according to Jean Felix, she left the scene to obtain a
phone to call 911,  Tr. 3-35.  Therefore, she could have missed anyone exiting
591 Middle Street; Defense counsel,  failed to investigate or raise the de-
fense of another although he knew that blood evidence collected from the de-
fendant, i.e., "toenail scraping" indicated someone in addition to the victim
and defendant; I told Attorney Segadelli and he failed to investigate Jean
Felix was making me eat food I didn't want to eat by balling up her fists and
stumping her feet at me when she cooked food I didn't ask for, she said, "you
are going to eat this", with her hands balled up in fists and shaking them at
me and stumping her feet.  When friends came to the park to play ball everyday
from where we use to live on North Main Street, across town, Ms. Felix would
go upstairs to her 2nd floor and get her basketball and say that, "you are
going to play with me and no one else, "balling her hands into a fist and
shaking them at me threateningly and stumping her feet.  So I played with her
until she got tired.  I told her often that I please only wanted to be a fri-
end, which turned out to be a big mistake.  Two days before Officer Guinta was
shot, Ms. Felix put a bottle of Hawk Cologne and 7 new dishes at my door.  I
was out shopping when I returned home.  I found the cologne and 7 dishes in
front of my door.  I rung Ms. Felix's apartment bell and she came down in
green panties wrapping a green wrap around skirt around her waist.  I explain-
ed to her that I couldn't accept these and gave them to her.  She snatched
them and ran upstairs slamming her door.  Two days later she came down stairs,
on August 24, 1994 at about 3:10 PM the day assilant shot Officer Guinta, I
was asleep.  Ms. Felix started banging on my door with her fists and feet and
crying out loud that she wanted to have sex with me and a relationship for
about 30 minutes.  I tried to explain to her I only wanted to be a friend, a
neighbor.  Paul Pike, Maintence Man for Frontline Properties was out in the
yard near my apartment he heard the whole thing., Before he started mowing
I ask Jean if she would go out with Paul?  She said no very loudly, and cry-
ing and said she only wanted me.  He daughter Kelly told her to, "come on Mom"
and they left.  I got up and went to the windows in my frontroom and saw them
drive off.  I received a statement from Cynthia Parquette and owner of Front-
line Properties, Eric Mello who said no one was in front of the apartment
building, Paul told them.  Attorney Segadelli was told this by me but didn't
investigate Paul as a defense witness to impeach Jean's false testimony along
with Raymond Boulay's testimony that neither Jean nor her daughter Kelly were
in front of the apartment building at all on August 24, 1994 when the shots
were fired by the assilant and 8 people ran out of the apartment building.  On
August 24, 1994 I didn't see Jean Felix nor her daughter Kelly until around
3 PM only.  A older black man (TR5) standing with Jean and her daughter Kelly

**12. A.** <u>Supporting Facts, continued from back of page 6</u>**:**

would impeach her lie that I said "he tried to shot me, so I shot him".  All
was a lie.  And all her testimony the "older blackman" who lived next door
standing outside would impeach Jean and her daughter and the detectives who
arrived at the crime scene first and switched the younger detective driver
for a 15 year veteran police detective who was not there, but took the stand
and lied.*  Harry Davis, Jr. and I went to Veteran Outpatient Clinic because
I needed help in 1992 to get the Veterans Unemployment benefit.  We were told
by the Outpatient Intake Worker and Mr. Robert Shepardson, Social Worker that
they stop walk-ins yesterday.  I told them I need V.A. unemployment benefits
because there are no jobs.  I've looked everywhere.  The Outpatient Intake
Worker and Mr. Robert Shepardson said that Harry I needed the benefit but I
need to make up/or do something to get accepted into Outpatient Clinic.  So I
ask about a lie with their acceptance a course that I needed mental health.
They helped me with it and accepted me into Outpatient Clinic where I received
my veteran unemployment benefit from V.A. Providence, RI.  I told Attorney
Segadell about this.  He used this anyway.  Trial Counsel was told that Dr.
Katz, School Street, Fall River, MA was not to be used because I told Dr. Katz
that I did not want to pass the ink blot test and Rorchael test I studied in
Undergraduate School and I didn't want to pass it because Social Worker at
Fall River Department of Public Welfare said that if I passed it I would not
be eligible for AFDC which was more than the Veteran Unemployment benefit I
was receiving a month, which was $640.00 and the AFDC was $781.00 a month.  So
I didn't try to pass it I told him and Dr. Kolber that I did not want to pass
it.  Harry Davis, Jr. my friend was there.  So I went back to Fall River De-
partment of Welfare and told them I didn't want the AFDC it would have been
fraud.  Attorney Segadellie use the results anyway in his own insanity de-
fense where I pleaded not guilty and I had explained all of this to him.
*I told Attorney Segadellis at trial two weeks before the assilant shot off-
icer Guinta, that Sgt. Kenneth Norwell was not one of the police officers who
came to my apartment with officer Robert Deschenes who also lied about it and
what happened at trial.  A very young police officer, who also was there at
129 Fifth Street, falsely arrested me on 2/24/93.  The prosecutor, DA, unlaw-
fully switched, him for Sgt. Norwell a 15 year veteran who lied about what
happened at my apartment building, 3 officers responded with no sirens on two
cars and flashing emergency lights.  They said that they received a call from
police headquarter to check on a 7 foot man.  They didn't know his name or
identify.  I had relatives over at the time.  I made no racial remarks as they
lied and said.  I stood almost outside of my doorway.  We talked for a while
about person they were looking for.  I told them I will ask my neighbors and
get back in touch with them.  They left.  I left a message at police head-
quarter that the neighbor knew nothing about this.  On August 24, 1994 after
assilant shot officer Guinta, the young detective and officer Leo Rebello came
up in a green and white detective car.  It took them 45 minutes to first arr-
ived at the crime scene.  This time could have caused Officer Guinta's death.
The older black man (TR5) was standing outside all the time between Jean and
her daughter Kelly.  And he will impeach Sgt. Demello testimony and Detective
Rebello's.  I told Attorney Segadelli that this same young detective and de-
tective Rebello in 1992, in the same green and white detective car had circled
around and stopped next to my car, and rolled down there passenger side window
and we all saw both of them, when I drove Darlene and Charles and another

(continued on page 7a)

**12. A. Supporting Facts, continued:** continued from Page 7a

couple over to a friend's house in Fall River. Darlene and Charles and the
other couple called detective Rebello and young detective by names and said
they knew of them. With the "older black man" and Charles and Darlene and
the other couple would identify the young detective switched by D.A. and
Sgt. John Demello. And relatives can identify that Sgt. Kenneth Norwell was
not there 2 weeks before the fatal shooting. After trial and I was falsely
convicted for murder, this same young detective walked into the holding cell
and pointed at me and laughed out loud. I told Attorney Segadelli at trial
that they switched Officer Guinta grey uniform he had on that day he was shot
to a navy blue one. I also told Attorney Segadelli that at interrogations at
police station I asked if the victim shot by the assilant was a security
guard because he had on grey uniform and how was he doing"?, and Officer Mich-
ael Malek who falsely arrested me later on that day but whose whole testimony
was a lie, said he was a Fall River Police Officer and he was dead". And I
said, "I am very sorry to hear that". They didn't say this at trial. Detect-
ive Leo Rebello did not arrest me, he lied and Sgt. John Demello was not
there. The older black male at TR5 will impeach their lying testimonies. I
did not say "I shouldn't have." Their whole testimonies were lies. Their
again is another Sergeant Albert Dupere who wasn't there. I never said to him
or anyone "I don't know who did it". He lied. Three blue uniform Fall River
police came into the hallway. They asked Jean Felix what had happened. She
said, "I don't know." The young detective and detective Rebello have left. I
was inside my apartment sitting down waiting to be of assistance. Please see
Jean Felex testimony TR3-43 (Raymond went into his apartment). They believed
all the scorned lies of Jean Felix but not this. The 3 officers came into my
apartment. I told them the truth that 8 people were fighting in the hallway
with Officer Guinta and one assilant grabbed the officer's gun and shot him.
I jumped between them, stuck my right thumb between the hammer and the firing
pin to stop the shooting. The assilant dropped the gun and left. The hammer
firing pin stuck deep into my thumb causing severe pain and bleeding. The
hammer and firing pin left a shroud on my right thumb. An imprint of the
hammer and firing pin is there. I told the 3 officers that the 8 ran into the
park. They drew their guns and ran out of the building. The young detective
who didn't testify, Officer Rebello and 3 officers didn't stop to help Officer
Guinta. About 10 minutes the three officers returned and said, "that there is
nothing we could do". They left. While the 2 EMT's were helping Officer
Guinta (about 45 minutes for detectives to arrive, and about 15 more minutes
for EMT's to arrive and Saint Anne's Hospital was one block down the street.
This could have caused the Officer's death). Officer Michael Malek who lied
and said he didn't falsely arrest me, and he did. And I need a statement from
EMT's too the difference between a blue uniform officer (Malek), arresting me
and the time they were helping Officer Guinta and lieing testimonies of swit-
ched Sgt. Demello, who was not there and Detective Rebello who lied and said I
was already arrested. Above I talked about the truth that Officer Guinta had
on the day he was fatally shot by assilant. I had this same information in my
notes, at Bridgewater State Hospital where these notes were read by Richard F.
Sidorowicz and he relayed this information to the Assistant District Attorney
Moynahan and they changed this grey uniform to blue regular uniform. I never
seen Fall River Police officers wear grey. I thought that the officer shot by
assilant was a security guard. I told this to Attorney Segadelli by letter
and in person, he said at trial that CPAC investigations said that Sidorowicz
was seen in my legal papers.

I told Attorney Segadelli that on February 23, 1993 I was framed and falsely arrested for an alleged breaking and entering in daytime and alledged larceny of property, $250.00 or less. When two weeks before 2/23/93 my landlord, Keith Branco fixed a faulty wiring in this old apartment building inside my apartment. Keith asked me if I could for him clean up his empty apartment downstairs on the second floor for him because he had a lot of work to do and he had a couple moving in there in two weeks. I told him, "yes, I'll be happy to help and clean up." Keith also asked me to check in the 120 volt sockets for any burnt or faulty wiring". I told him, I would. He took me downstairs using his keys open the second floor apartment door and took me inside. It was empty. He showed me what he wanted me to do, clean up and where to look for any burnt wirings. He asked me to call him if I had any questions and any costs of cleaning materials or new fuses for the fuse box (the apartment been empty over 2 years he said) he would, deduct money from my rent because he had no money. So I said okay. I went upstairs and put on an old worn shabby but clean sweat suit. I took my ladder and some cleaning materials from my apart- ment. I unscrewed the 120 plug in plastic coverings around the walls. And looked for burnt wirings which could cause fire in this old building. I found some. I looked in the ceiling panelling above by using the ladder. I found another burnt wiring. I used my parents telephone number in B'ham, Alabama. I charged myphone calls to Mr. Branco to their phone. I told him what I found. He said he'll be over in 2 weeks and asked me to leave the 120 plastic cover- ing plug-ins off and ceiling paneling moved to the side so he could find them if I was away and not home. I said "yes Sir". I saw David who is the boy- friend of Deborah Branco (Keith seperated wife, Keith told me) and told him exactly what Keith had me to do on the 2nd floor. He said it was nice that I was helping. I asked David could he check for me the 2nd floor apartment fuses box in the basement. He said yes. So we both went down stairs. He checked and told me I had to buy some new fuses and to take the old ones to the hard- ware store with me to ensure the same exact kind. So I did. I bought them and gave them to David. He replaced the old ones for the new ones. I kept the receipts for Keith as he had asked me too. I cleaned up the two bedrooms, living room, kitchen and bathroom areas and walls and the rugs. Mr. Branco told me on the phone to replace the storm windows which were broken. I did. The second week on February 23, 1993, I left the door open for my landlord and kept my ladder there so he could use it, and coverings and paneling on the floor the way he had asked. I went upstairs to my apartment. David called me downstairs. I went downstairs and he and Mrs. Debrorah Branco were there. David said get your ladder. And he told Mrs. Branco to call the police. So I thought something was wrong. So I hurriedly got my ladder and went upstairs. About 4 minutes I heard voices. Then three uniform Fall River Police came up to my apartment. I asked them how can I help them. They looked around my apartment. I told them if they have any problems to please call my landlord, Keith Branco I tried to give them his telephone number. They looked at it and looked away. They asked me to get my coat. So I got my coat and I followed them outside. I asked them should I take my car. They said no. So I got in the back of the police car. No miranda warning. No explanation was given. They drove me inside of Fall River Police Station and a tall police officer was at a desk. I asked him "Sir, I don't know what this is about, here is my landlord's telephone number if you need any information about his apartment

9

building please call him." I saw my name in a ledger book with nothing beside it.
I told the Officer I was a law graduate. He jumped up threw me very hard
against the wall and said a law graduate, uh? I said, yes Sir. He put my
right arm behind my back and pushed me downstairs to a holding cell area and
put me in a cell. The next morning an officer brought me an Egg McMuffin and
a carton of milk. At 8:00 AM I was handcuffed and shakled (my legs) with 4
other men. We were escorted by 3 police officers into Fall River District
Court. Someone came and whispered in the Judge's ear. And me and another guy
who was white was takened out. We were put in the back of a police car and
taken to Corrigan Mental Health Center. There I saw my son Ray-Ray. He told
me that Mrs. Branco had told the doctor that I broke into her 2nd floor apart-
ment and removed some paneling and removed the covering for the 120 volt out-
lets. I told my son that was not true that Mr. Keith Branco asked me to clean
up his 2nd floor apartment and he used his keys to open his 2nd floor apart-
ment door and let me in. And it was empty. And he asked me check into 120
plug in sockets by removing coverings and check the wirings to see if they
were burnt which could cause a fire. I saw Dr. Kolber who did the AFDC eval-
uation with Dr. Katz which I explained in 12. A. Supporting Facts above con-
tinued from back of page 6. Dr. Kolber asked me what happened I told him the
same as I did above. i.e., that my landlord, Mr. Keith Branco asked me to
clean up for him, because he had a couple moving in two weeks and Keith used
his keys to open his own 2nd floor door to let me in to clean up. And check
the 120 volt plug in sockets by removing the coverings for burnt faulty wiring
so no fire can happen. Also check wiring under the ceiling paneling. (Rich-
ard Sidorowicz misread this by wrongfully reading my legal papers and letters
to Attorney Segadelli when I was not around, and he lied at trial and said I paint-
ed the ceiling. But the ceilings had white panneling coverings.) So he said
the police and Debroah Branco didn't call her husband to check this out. So
he wrote this all on a form and let me read it. And I signed it. Asked him
for copy. Dr. Kolber said the Court will give me a copy. So I was taken
back to Court with same white male. When we got back to District Court the
Criminal Law Judge was having a criminal law class with law students. A
whole class. We were taken to a Civil Courtroom and a Judge came and he dis-
missed the white male. And he asked me how I pleaded and I tried to tell him
that I was innocent and what had happened. I told him I could represent my-
self, I was a law graduate. He said no. He got for me Attorney Mariam Bab-
bet. I told her what happened. The Assistance District Attorney began to
make up things which had nothing to do with the case. The Judge asked him
where did he learn that from. He said law school. The Judge asked me what
happened and I told him that my landlord Keith Branco asked me to clean up
his 2nd floor apartment and to check both 20 volts outlets plug for burnt wir-
ings and behind the ceiling panelings for burnt wirings could cause a fire.
And check the fuses downstairs and see if they are good or not. And I ex-
plained to the Judge that I explained everything the same as I doing here to
David, boyfriend of Mrs. Debroah Branco. And that Mr. Keith Branco my land-
lord will deduct any out of pocket expenses from my rent. The Judge said
okay. What do you want me to do. I said, let me go home, I'm innocent! He
said, "Okay this is dismissed". He said to the 2 police officers". Go back
get Raymond's strings to sweat pants and strings to his sneakers and his coat

and let him go home". He said I am going to repeat this to you again, and said the same thing again. So we walked back to jail and the desk sargeant said, "What happened to Mr. Cook". One officer said, "Corrigan and 20 out-patient clinics........". The other officer said "Taunton Mental State Hospit-al". I said, Sir, I am a law graduate the Judge said that this case is dis-missed and for the officers to give me back my strings for my sweat pants and laces for my sneakers and my coat and let me go home". The desk sargeant ask-ed a female officer to call the Judge. She did. I told her the Judge was not the regular criminal law Judge he had a criminal law class going on, but a Judge from Civil Court. She called but she said it was 4:30 PM and Judges were gone home. (Right there there seems to be a mix up on the Judges) the one who, I first saw at District Court who sent me and a white male to Corrig-an Mental Health for Criminal Court was doing Criminal Law Class and the other Judge who was in Civil Court. The desk sargeant said "I am sorry Mr. Cook, I'm going to have to put you back downstairs until I get in touch with the right Judge". I stayed in jail from 4:30 PM until 8:30 PM. And a police off-icer came downstairs with a 15b that said I had to go to Taunton Mental State Hospital. I said there is a mistake did the desk sergeant talk to Judge at Civil Court who told me go home? He said he didn't think so. This was done without a hearing in Court. I stayed at Taunton until I could get in touch with my landlord Keith Branco, almost three months. He said, "He didn't know what had happened and I told him everything. He asked me to call Debroah Bran-co in ten minutes and he was going to call Debroah and David and tell them that he had asked me to clean up his 2nd floor apartment and remove the 120 plug-in sockets and ceiling panelings to look for burnt dangerouse wirings which could cause a fire and he used his own keys to open his 2nd floor door for me, and he let me in only. And any cleaning materials or fuses out-of-pocket cost I had he would deduct from my monthly rent. Ten minutes I called Debroah Branco and she apologized and said "I'm sorry Raymond". I didn't know Keith had opened the door for you with his key, and I didn't know he told you to remove the ceiling panelings and wall socket 120 plastic coverings and check for burnt faulty wirings (which they wrongfully charged me larceny of property in an empty apartment). She said you had a cat and phone and people came by I thought you were talking to yourself. You have a phone and people stopping by I am so sorry. I thought you were taking over the apartment. I'm sorry Raymond. I asked her to please get in touch with the Judge and prose-cutor and Taunton Mental State Hospital.....and please explain this to Dr. Chetfield Taylor. She said she would. I told Dr. Chetfield Taylor what happened. But Taunton said they didn't hear from the Court so they did invol-untary commitment but I was released in three weeks to go home. There is an incident at Taunton. One day a staff member was fighting a young inmate named Mike. Mike was small, very young white male. While the male staff person was punching him in his head and face the other staff method was not to look be-hind at the male staff member or turn to help him, with the back to the in-cident happening but all other staff members were to face the (us) inmates. I talked to them and pleaded with them to please turn and look at their male staff member punching Mike in his face and head. They refused. So I tried to point at them to look behind their back, to turn around. They all grabbed me threw me down and put me in 4 restraints and shot me with hildrof medication. I asked young Mike why he didn't tell the staff that the male staff was beating him. He said it would matter, they wouldn't do anything about it anyway.

11

At trial I told Attorney Segadelli the woman who just testified showed a prob-
lem. Officer Guinta went east on my street then skipped my apartment building
and went west, to a lady's house, the lady who is testifying, who lived alone
with her son and the police hang out there. Than he came back to my apartment
building in the center. I told Attorney Greenberg that her transcripts are
missing the testimony of this witness. Also this was in my notes Sidorowicz
read too. And Sidorowicz must have told this to the prosecutor and somehow
they removed her transcript. Cynthia Parquette and Eric Mello had sent affid-
avits saying that Paul Pike their maintainance man, who cut the grass that day
Officer Guinta was shot by the assilant, said that neither Jean Felix nor her
daughter were there at the apartment building when he finished mowing the grass
and they were not in front of the apartment building at 3:30 PM on August 24,
1994 but at trial, Attorney Segadelli lied to them and told them I wanted an
insanity defense and they changed their testimonies. Trial Counsel said at
TR 3-4 at trial that I couldn't keep a job. This was not true when he had in
his files that I received from excellent letters of recommendations, and be-
cause of State and Country high employment problems, the State laid off mid-
level managers which included me and very few blacks worked in Gov. Dukakis's
State government in 1989. Trial Counsel said at TR 9-32 that I didn't have
interpersonal relationship when I gave him a list of friends and acquain-
tences which I found in his files I received from him. Also I asked him to
locate as defense witnesses. Trial Counsel failed to have me testify and ex-
plain why I had on a green mechanical jump suit because it was the day I put
very large metal garbage cans to be collected for the apartment building and
hose down the garbage can storage area. I used this green mechanical suit so
I wouldn't get scratched by metal cans. Also to do work on my car which is a
hobby. I told Attorney Segadelli at trial that Officer Malek who arrested me,
but lied at trial and said he didn't, told the truth that my windows were
closed on August 24, 1994 because garbage can smells right near my apartment
and basketball games were going on across the street. I was trying to take a
nap before my son with my new grandchild Taylah and my son's fiance came home
at 3:15 PM. I told trial Attorney Segadelli in letters and in person that two
months before someone broke into apartment #2 upstairs and broke in half the
whole front door and stole money from the people who lived there. I contacted
and talked with police officer when they arrived. I told Attorney Segadelli
that state ballistician lied and said Officer Guinta was possibly shot inside
my apartment to falsely convict me. I asked him to test DNA and ballistics
for true facts. Officer Guinta was shot by assilant in the hallway. Trial
Counsel failed to have a defense legal expert take pictures of my right thumb
where I jumped in between the assilant and Officer Guinta and stuck my right
thumb between the hammer firing pin and bullet stopping any further shots
being fired and assilant drop the gun and all 8 of them ran. The bloody
right thumb is in the transcript. My hands were not swollen from fighting
anyone and blood from my right thumb was bleeding very profusely and would
have been all over the officer's face, etc. Trial Counsel was told by defend-
ant that police had been giving me problems in Washington, DC after graduating
from law school;in B'ham, Alabama; in Boston, Massachusetts; in Cambridge,
Massachusetts; in Fall Fiver, Massachusetts when I first arrived in 1992. I
told the law school admissions and perspective job employers and the Chairman

of Massachusetts Bar Committee that I wanted to be the first black United
States President and white police seems to give me problems since then.

I told this to Attorney Segadelli and he said he knew about these facts and the Judge knows and Deborah McGowan, Social Worker, taught at Bridgewater State Hospital, Restoration Classes for inmates who the Court or their Attorney or prosecutor sent there for competency and criminal responsibility evaluations. Ms. McGowan taught us that Massachusetts Attorneys, District Attorneys, Assistant District Attorneys, Judges for all Courts, Justices for the Supreme Judicial Court, the Massachusetts Secretary of State, Governor, Members of Massachusetts State House and Senate knows about her classes and about what she taught us. And unless we agreed to what she taught us then we will not be found competent to stand trial have anything to do about criminal responsibility. Ms. McGowan taught this very often in each of her classes. I took her classes at least 4 times. Two (2) on my own to hear if she was consistant in all her classes and she was very consistant saying the same things over and over again. And two when both doctors at Bridgewater State Hospital, Doctors Haycock and Mosokowitz did not write my truthful answers on their evaluation reports. And when I asked them to please re-read what I just answered to them, they couldn't. So I told this to Attorney Segadelli and my parents. Attorney Segadelli told me and my parents to hire for money another doctor and private lawyer for me to be found competent. And we did! I hired Dr. Katz and Attorney Elliot Levine, who I sent all my legal researches and letters too and he sent the Court an Affidavit saying that at all times I said I was innocent and did not want an insanity defense. Please see 12A Supporting Facts on continued, back of page 5. And Ms. McGowan going to each of us seperately and asking do we understand and she threatened if we did not agree to what she said we will not be allowed to be considered for competent to stand trial or criminal responsibility until we do accept this. That if at Bridgewater State Hospital while we are there, if we do not get along with out Attorney or at trial we will not be considered competent or criminal responsibility until we do. At Trial we must ask our Attorney permission for me to speak with the Judge. If our Attorney said that I can't speak with the Judge there is nothing we can do about it. We can't stand up or raise our hand or talk to Judge on our own. I asked Ms. McGowan, "doesn't the Judge suppose to do a colloquay to see if you want an innocent defense or to testify". She said they do, but sometimes they do not. If the Judge asks you, Ms. McGowan said that is fine, answer the Judge. But if he/she doesn't ask you, you can not on your own raise your hand or stand up or talk and ask the Judge can you speak with the Judge. You must ask your Attorney first and only your Attorney for permission to speak or talk with the Judge. If your Attorney says no, there is nothing you can do about it. You sit there grin and bare it. All the Judges, Attorneys, District Attorneys and their assistant District Attorneys knows about this. And you must accept this now individually in class or you will not be considered for competency or evaluated for criminal responsibility until you do. And I ask Ms. McGowan does the United States Constitution and State Constitution guarantees you civil and legal rights to a fair trial, right to an attorney, right to not to talk to the Judge if something is wrong, right to confront your false accusers and the right to an innocence plea? She said very sternly there is nothing you can do about it. I told her I was a law graduate and do I have a right to raise my hand properly and speak with the Judge for his or her help as I was taught in law school? She said no, nobody! And she said she meant it. Then she said at trial if your Attorney

14

does or says something wrong that you disagree with or you don't like, you
don't do anything about it, you sit there grin and bare it. I asked her
"if your Attorney says you are insane or raises the wrong defense what can
you do about it? Ms. McGowan said, "to sit there and say nothing and do
nothing to the Judge, you grin and bare it. If you don't agree with what
I'm saying she said, you will not be considered for competency or evaluated
for criminal responsibility until you do agree." At trial Attorney Segadelli
did an insanity defense after he and I and my family had agreed that I was
innocent, not guilty and this was my only defense. All of my letters and leg-
al research was only about my innocence, me being not guilty. At trial I ask-
ed Attorney Segadelli what is he doing? Why is he doing an insanity defense?
Where are my Defense witnesses he should have called and investigations and
forensic experts to contest the D.A.'s false and made up evidence? Why can't
I testify? Why can't I talk to the Judge? He said there is nothing you can
do about it. And I'll be found incompetent if I do try and testify or speak
with the Judge. So I couldn't say that I wasn't insane in the Attorney/Client
conference after Ms. McGowan's threats, duresses and coercion and Attorney
Segadelli's threats too... I had to wait to get an affidavit from Ms. McGowan
telling Court and Massachusetts Attorney General that she threatened me and
others in her classes with the statements and threats. And Attorney Segad-
elli threatened me at trial before the Attorney/client Conference and at trial
I kept asking him when can I testify or speak with Judge Tierney about this
false insanity defense which he lied about. And he said no. And he kept say-
ing a lie that I was insane and I am not. I was frightened to go back to
Bridgewate State Hospital again because if I disagreed with Ms. McGowan in her
classes or Attorney Segadelli at trial 1 would be found not competent. Both
Ms. McGowan and Attorney Segadelli said at anytime during trial, Judge Tierney
the prosecutor or Attorney Segadelli himself could stop trial and find me in-
competent and send me back to Bridgewater State Hospital for one year before I
am reconsidered for competency and criminal responsibility. And I have to
take Ms. McGowan's restoration classes again with all her same threats, coer-
cions and duresses to me and other inmates. 1 talked with inmates who were
not found competent to stand trial in 10 and 15 years. This was frightening
along with State prosecutor and their false witnesses and false made up for-
ensic evidences. Because of all of this and the threats I lied and said I was
insane until I can find help. Mr. Eric Brown, an inmate at Bridgewater said
his Restoration Classes did the same. He did an affidavit for the Court say-
ing those same things. I said all through the Attorney client conference that
I was innocent only and that's my only defense. And I tried to let Judge
Tierney and S.J.C. Justices know that I was trying to get my parents there on
record in the Attorney/Client Conference so they can help because off record
Attorney Segadelli said often both that I wasn't going to testify and threat-
ened me with incompetence. Because both Ms. McGowan and Attorney Segadelli
threatened and illegally schemed so I couldn't ask for help. Justices at
S.J.C. Supreme Judicial Court of Massachusetts said in their denial of my dir-
ect appeal that if I had spoke up the next day and talked with the Judge the
outcome would have been different. S.J.C. was not aware of all these threats
and intimidations. But because of these sternly put threats, duresses and
coercions by Bridgewater State Hospital's McGowan and Attorney Segadelli that
I could not speak with Judge Tierney in Court at trial on my own and that 1

15

had to ask Attorney Segadelli for his permission only to speak with Judge
Tierney.  And if Attorney Segadelli said no, "there was nothing I could do".
And if I spoke on my own then I would be considered incompetent by Judge
Tierney, Attorney Segadelli or prosecutor Mr. Moynahan.  And when I'm return
to Bridgewater I will not be reconsidered for competency or evaluated for
criminal responsibility for one (1) year.  And if I don't agree to these
same demands again; not to talk to Judge on my own at trial; not to disagree
with Attorney Segadelli when he raised the wrong insanity defense against our
agreed innocence defense, not guilty and nothing I could do about it but grin
and bare it, or he didn't test the made up forensic false evidence, didn't
call defense witnesses or rightfully, and effectively investigate witnesses
and case.  And didn't act effectively at trial on the switching of young pol-
ice officers and put 3 sargeants, who had 15 years of experiences and who
were not there at the crime scene or a month before, changing the grey unif-
orm to blue, finding the defense witnesses against Sidorowicz which I had
wrote him about and they were available to talk and testify against Sidor-
owicy lies and knew he was a "plant" by the prosecutor; ineffective when I
asked him at trial to tell Mr. Raymond Boulay the truth that I didn't want an
insanity defense, I'm innocent.  And to please tell the Court the truth that
Attorney Segadelli came out to Bridgewater State Hospital and told me and my
family that Mr. Boulay said that neither Jean Felix nor her daughter were in
front of my apartment building when the shots were heard and 8 people ran out
of the apartment building. And Trooper Blaney and Medieros lied about the in-
terrogation and said I called them "Your Excellency".  And they said a lie
about the gas man, Thomas Delzeno who was not even at my apartment building.
And I asked them about if the person shot by the assilant was a security guard
because he had on grey uniform and Officer Malek who falsely arrested me said,
"No he was a Fall River Police Officer. And I asked how is he doing?"  And Off-
icer Malek said, "He's dead".  I said, "I'm sorry to hear that"and everything I
tried to tell Attorney Segadelli at trial and he refused to do anything to
help me and was very ineffective, and I had to wait to bring all of this to
federal Court because Attorney Greenbery Appellant Attorney did not have fund-
ing for a private investigator.

16

I told Attorney Segadelli this whole truth and sent this in letters and legal research and will not used Debroah Branco, its no need too, and he said he understood.  But he lied to Debroah Branco and told her I wanted an insanity which was a lie but she trusted and believed Attorney Segadelli and she and other defense witnesses had no way to get in contact with me to ask the truth of my defense of innocence, not guilty.  She  felt this would be a way out for me, Attorney Segadelli lied and told her.  Attorney Segadelli was part of the prosecutor conspiracy to put me in prison for life for a crime which I am innocent of.  One of the young police officers who came to 129 Fifth Street, also came with Officer Robert Deschenes to 591 Middle Street, but he was switched as I explained on back of page 7.12.A Supporting Facts, continued from back of page 6; and Page 7a.

17

Before trial and at trial I asked Attorney Segadelli to please
hire legal defense experts who would contest the made-up false evidence
by the State. Before trial he said he would. At trial he again
threatened me with incompetence. Officer Guinta was found in the
hallway. Away from my door where after the assailant shot him to where
he fell. There were no blood dropping leading from my apartment. The
autopsy report is a fabrication because Officer Guinta was shot by the
assailant at point blank range. Officer Guinta was not shot in the back
of the neck which would have sprayed blood over my face, hands and
clothes. By this shot, Officer Guinta would've landed on his frontal
portion of his body with lying face down. When I saw the assailant
shoot, Officer Guinta was trusted backwards and down. Attorney
Segadelli, ineffectively failed to hire a legal forensics expert for the
defense.

I asked Attorney Segadelli to investigate Thomas Delzenero from Fall River Gas Company. On August 24, 1994 the day assilant shot Officer Cuinta, no gas man came to my apartment. Neither Jean Felix nor her daughter was there at the time she lied about it at trial. Two months before August 24, 1994 a Fall River gas man in a old ragedy gas truck came to ask me to pay a gas bill my parents helped me to pay. He asked me for the keys for the basement. I refused because there was no notice from gas company. And I was warned by a gas repair man, named John when I first moved to 129 Fifth Street, that people will say anything to get inside your apartment or apartment building and kill you to break in and that Fall River, although it is small compared to Boston where I come from, but it is very dangerous he told me. Don't let gas people in or anyone in because people will do you harm. Go down to Gas Company or call and see if they sent someone out. I called but they had no record of sending out anyone. Thomas Delzenero lied at trial. I never seen him before I told Attorney Segadelli at trial and in letters that he should check and see if Delzenero was at work that day or somewhere else at the time he didn't come to 591 Middle Street that day nor have I ever seen him before* The right to colloquoy by the Judge Tierney to testify at trial. Trial Counsel was told by me to object and was ineffective for failure to challenge the integrity of the jury venire. Failure to object and challenge the prosecutor's peremptory challenge of two black prospective jurors. As a cumulative effect of multiple errors of constitutional Magna Culpa, defendant was denied a constitutionally fair trial, thus creating a substantial likelihood of a miscarriage of justice. Appellant Counsel, Ruth Greenberg refused to raise Aponte in her letters and any of these harmful constitutional issues. I told Attorney Segadelli that I have put in for jobs as police officer in 1971 to 1975 while attending Northeastern University full-time. And I have worked with police officer at Station houses and Courts all my career to divert our youths from the criminal justice system. And I started the Challenge Program, a Youth Division of Youth Service (DYS) which started at the Boston YMCA and is now and intense program with a lock up on the Boston State Hospital grounds. Attorney Segadelli was very ineffective for not bringing this to the trial courts and jury's attention. Attorney Segadelli was very ineffective when he used a fraudulent and inept psychologists Doctors Haycock and Mosokowicz who I told him about that they did not write down exactly in their evaluations what I was truthfully saying. I sent him legal research and letters saying that they did not write down what I was saying. And Attorney Segadelli told me and my parents to get a private doctor and a private attorney to be found competent. We did. This constituted the ineffective assistance of counsel. An inmate at Bridgewater State Hospital gave affidavit which said that Richard S. Sidorowicz had tried to steal expensive painting from him and his wife. The correctional officers at Bridgewater allowed me to carry this affidavit to court. I gave this same affidavit to Attorney Segadelli and also again informed him about the cadres and inmates at Bridgewater State Hospital. I waiting for him to get affidavits from them to impeach Sidorowicz lies and also this affidavit I gave him at Court was to be used to impeach Sidorowicz's lieing testimony. Attorney Segadelli refused to use the affidavit from the male inmate at Bridgewater and did not go to Bridgewater State Hospital to speak and gather affidavits from cadres and inmates as I wrote and asked him to do and he had

*The same true facts that because of those threats of being found incompetent and having to returned to Bridgewater State Hospital for one years before being considered for compency, by both Ms. McGowan and Attorney Segadelli. I couldn't speak out to Judge Tierney unless I got permission from Attorney Segadelli, and he said, "No".

this same letter in his files I received from Appellant Attorney Greenberg at my request of all his documents and letters regarding my case. Attorney Segadelli was ineffective. And because the Federal Court uses the miscarriage of justice standard, all these issues herein are miscarriages of justice. Officer Leo Rebello lied said I tried to hand them the gun in a surrend fashion and he lied and said I said you don't need that. All was lie and the older man (TR-5) next door was there and will testify that this all was a lie. Attorney Segadelli, Trial Attorney and his private investigator came after they falsely convicted me and said, "I know you are innocent". I wrote him a letter saying that he said this and I said, "Thank you, that I would never do a crime or kill anyone". I will try and get an affidavit from Attorney Segadelli's private investigator. My letter to him was found in all the letters and legal research I did on my innocence, not guilty. Attorney Segadelli was told that on a March 9, 1998 letter from Assistant District Attorney Nadeau, Jr. that Steven Sylvester saw a woman before or after he heard the shots run out of my apartment and went into the back yard. Although I told Attorney Segadelli that police reports were false and doctured by police. He should have investigated every witness he could find because I'm innocent and he agreed before trial that I am innocent. While at Bridgewater for 4 years I and others notice there was no news on T.V. about me. None! After I was falsely convicted Reggie, another guy I played basketball with in Fall River said people in Fall River were upset because they all knew I was innocent than Attorney Segadelli said on the Fall River T.V. news a lie that I wanted an insanity defense. But that wasn't broadcasted on the news at Bridgewater State Hospital. Reggie said people were hurt and angry. I told Attorney Segadelli that the Fall River Division Employment Security told me that I could come down to their office only once a month because I was there begging for any kind of job but there are none they said. I told Attorney Segadelli that I visited and sent resumes to all the law offices in Fall River and nearby. And I was willing to take any kind of job, even I asked my son Ray-Ray if I could work at the YMCA where he was working, he said yes. I went down there and the lady supervisor said they were laying off people and they didn't have any kind of work full-time or part-time. There were no jobs in Fall River in 1992-1994 (Please take Judicial Notice, I have newspaper clippings about this). Many people where at the Welfare Office and Church on North Main Street, who gave a long line of us a bag of groceries and the Salvation Army helped too giving foods.

Prosecutorial misconduct based on the following: Paying leading Commonwealth witness Jean Felix, in exchange for her knowingly false and highly prejudicial testimony, which deprived the defendnat of a fair and impartial trial as guaranteed by the Sixth Amendment of the United States Constitution and Art. Twelve of the Mass. Declaration of Rights.  Deliberately feeding Richard Sidorowicz facts, about the case to make him appear credible before the Jury was so egregious and prejudicial in violation of the law.  Filing late and doctored police reports to paint the defendant as a crazy person with hatred for the police was egregious and prejudicial.  Knowingly presenting false and distorted evidence to the Grand Jury for the purpose of having that body Indict the defendant for a crime that he didn't commit.  Arguing facts not in evidence which prejudiced the defendant and deprived him of a fair an impartial trial, as guaranteed by both the Sixth Amendment to the United States Constitution and Art. Twelve of the Mass Declaration of Rights.

The Trial Judge unlawfully informed the jury of the consequences if the Defendant was found not guilty by reason of insanity.

On January 8, 2002 I forwarded a letter to my Attorney Ruth Greenberg my counsel on appeal and requested her to advance certain issues on appeal.  I have attached a copy of the letter.  Attorney Greenberg refused to advance my issues on appeal.  See pages 21 to 24.

Fr:  Raymond C. Cook
     MCI Cedar Junction
     P.O. Box 100
     South Walpole, MA 02071


                              January 08, 2002


To:  Ruth Greenberg
     Attorney At Law
     505 Paradise Road #166
     Swampscott, MA 01907


          RE:  COMMONWEALTH v. RAYMOND COOK


Dear Ms. Greenberg:

     I write to you at this time to respectfully ask that
you please raise the below issues on direct appeal, in addition
to the issues you already intend to present on appeal.

     1. Prosecutorial Misconduct During Closing (P.M.D.C.)
-- Impermissible Appeal to the Emotions and Prejudice of the
Jury:
          (a)   "One thing I'm going to ask you to consider
with everything, and it's been a long trial, it's been a couple
of weeks, you have your common life experience. It's all
context, and I think that's a very important thing for you
to consider when you go up to deliberate." [TR.9/58, lines
6-10] (the juror's every day life experience has absolutely
nothing to do with murder or the evidence presented);
          (b)   "Then [the defendant] went on over and turned
the heat on. If you take that isolated incident, put it in
context, he just had a blood bath argument with the gas company
...." [TR.9/62, lines 9-17] (to classify an argument as a
blood bath, taking place moments before a murder is a play
on emotions and prejudicial); and
          (c)   "One of the things you consider is whether
or not the victim suffered, and how long the suffering occurred
.... And you saw [officer] John DeMello testify on that stand,
and you saw, you observed his demeanor, you saw his eyes and
you heard his voice. Think of that when you hear that tape
.... And Tommy Guinta didn't stay with him that day, but you
know when you looked at Detective DeMello on that stand, he
[Officer Guinta] certainly stayed at least in memory with
him just as he did with Mrs. Guinta." [TR.9/95, line 24 through
TR.9/96, lines 1, 8-16]. (An emotional show on the stand by
one witness is NOT evidence that the victim suffered)

                              21

Page 2 of 4

2.  P.M.D.C. -- Improperly Vouching For The Credibility
Of Witnesses:

(a)  "**the people at the hot dog stand, their opinions
can be given credibility by you, ladies and gentlemen, as
to their observations and their feelings and their assessments.**
You don't have to be a psychiatrist." [TR.9/74, lines 8-12]
(in essence, the prosecutor is telling the jury the police
will not lie, where the people at the hot dog stand are police
and an employee of a police, the hot dog stand is a police
hangout [TR.3/82, TR.3/96], and is owned by a police officer
[See, Police Report of Officer Michael Jose Pleiss, dated
8/26/94]. See Also, [TR.9/82, Lines 17-18]);

3.  P.M.D.C. -- Ad Hominem Attack On Defense Counsel;

(a)  "Remember when we were kids you had an
expression 'Piggy Back'. All the psychiatrists that see him
after the homicide, they are all doing their police reports
piggy backing it back to 1992 and 1993 in Taunton. They want
to analyze all the things the doctors are telling you in
Taunton in '92, '93 **and give that full credibility. Okay,
do that, but they can't have it go both ways ...."** [TR.9/82,
lines 2-11];

4.  P.M.D.C. -- Arguing Matters Not In Evidence:

(a)  [TR.3/37, Lines 24-25];
(b)  [TR.3/39, Lines 5-8];
(c)  [TR.8/107-111];
(d)  [TR.9/56, Lines 23-24];

5.  P.M.D.C. -- Informing the Jury that **1st Degree Murder**
took place [TR.9/84, lines 12-13], See Also [TR.9/88, lines
20-21] (such argument directly relieves the jury of its duty
to find a degree of murder, if any, and leaves the jury to
believe that they have to find on 1st degree.)
6.  Judge's Error -- telling the jury that "**the
Commonwealth WILL introduce evidence in support of the charges
in the indictment.**" [TR.2/186](emphasis added),(in essence,
the judge is vouching for the prosecutor, thus, depriving
me of my right to an impartial judge);

22

7.  Judge's Error -- Denying Motion to Suppress [TR.4/108]
(Motion should have been allowed where the alleged admission
was not voluntary where I was a patient at a state mental
hospital under the influence of medication);

8.  Judge's Error -- Offering testimony not subject to
cross examination, and assuming role of prosecutor:

      (a)  [TR.7/55, lines 7-13];

9.  Judge's Error -- Permitting Hypothetical/Assumption
Relating To Case in cf:

      (a)  [TR.7/75, line 24 through TR.7/76, line 19];

10.  Judge's Error -- Limiting the Jury's Scope of Power:

      (a)  "It's your duty as the jurors to accept the
laws as I state it for you. You may not ignore any instruction
...." [TR.9/101, lines 9-11] (if the judge was going to limit
the jury's power, then the judge should have informed the
jury of nullification)

11.  Ineffective Assistance Of Trial Counsel (I.A.O.C.):

      (a)  Failure to Object to 1 (a)(b) and (c), Supra;
      (b)  Failure to Object to 2(a), Supra;
      (c)  Failure to Object to 3(a), Supra;
      (d)  Failure to Object to 4(a)(b)(c) and (d), Supra;
      (e)  Failure to Object to 5
      (f)  Failure to Object to 6
      (g)  Failure to Object to 8(a), Supra;
      (h)  Failure to Object to 9(a), Supra;
      (i)  Failure to Object to 10
      (j)  failure to Object to the numerous acts of
hearsay:
      i.  [TR.3/16 et seq.]

12.  I.A.O.C. -- Using My Religious Beliefs and Practices
to Support A Claim of NGRI. (in every instance where trial
counsel makes reference to my hair and "All", this is a part
of my religion, for which I have a constitutional right to
practice. See, Bible -- 2 Maccabees 13; and Numbers ch.6,
v. 1-21)

I don't mean to sound as though I'm telling you how to do your job, that isn't my intent, Ma'am. I only feel that these issues have merit and should be presented for the court's consideration. Thank you once again for your time and attention, and all the help you are providing me. I look forward to hearing from you soon.

Sincerely,

Raymond C. Cook

Raymond C. Cook

After I had asked Freddie Calendar, Block Officer and Correctional Officer Jimmy Sullivan here at Walpole Prison, may I please stay up over night to do my Reconsideration back to Judge Tierney. I showed them a letter from my Appellant Attorney Ruth Greenberg dated June 7, 2001, which said that Judge Tierney's Clerk told Attorney Greenberg that the judge was suppose to wait for me (to get a private investigator and legal defense experts for my innocence). But instead he denied my Motion For a New Trial on May 31, 2001. And that I had until June 30, 2001 to send this to Judge Tierney. After reading this letter Freddie Calendar and C.O. Sullivan said yes I could stay up over night. I worked during the days and nights which we were allowed time in the law library, I spent time doing research and got someone to type the motion for me and talked by phone to Attorney Greenberg. On June 20, 2001 after work I was asked to go to Mental Health Unit. There, I talked with Dr. Kolber who told me that he didn't know what had happened, but Freddie Calendar told DOC that I was up at night talking to myself. I explained to Dr. Kolber that I had asked Calendar and Sullivan if it was okay for me to stay up overnight because I had to do a Reconsideration with a deadline of June 30, 2001 back to Judge Tierney. And I gave the letter dated June 7, 2001 which they read from Attorney Greenberg to me which said that the Judge's Clerk told her that the judge suppose to wait to hear from me (to get a private investigator and legal defense experts for my innocence). And I had until June 30, 2001 deadline to have this in to the judge. Each C.O. said yes I could stay up and they would inform the night shift C.O. So I kept the T.V. on for time and so I couldn't fall asleep, because I had no watch at the time and the T.V.'s Clock was frozen on it. I talked with C.O.'s who were taking inmates out for urine tests and investigations, and to the night C.O. I asked, them for the time as often as I could. I don't talk to myself. Dr. Kolber said he didn't believe DOC or Freddie Calendar, but DOC said that I had to go back on the 3 milligrams of psyche-meds or go to Bridgewater State Hospital. I explained to Dr. Kolber that I had only until June 30, 2001 to complete and finish my Reconsideration back to Judge Tierney explaining to him that he had promised Attorney Greenberg and me that he would wait for me to hire legal help for my innocence. But Dr. Kolber said that DOC made this very clear psyche-meds or Bridgewater. He also said that I would have to stay there in Mental Health Unit - isolation Unit away from Segregation Unit. I couldn't go to law library, I was not allowed to telephone my attorney, nor was I allowed legal work there. I asked him could he call Attorney Greenberg? He said he couldn't do that. I talked with the psyche-meds doctor who told me the same things. I asked him if I could sign a Refusal Form for the psyche-meds because these are not Court-ordered and there was no reason for me take psyche-meds. He gave me the form. I asked Sgt. McArthur to sign the refusal with me, He did. I made it clear that this was a conspiracy by Calendar and DOC to keep me from timely filing my Reconsideration. I asked the psychologist if a call could be made to Judge Tierney and the answer was no. I also requested if I could call my parents with a negative result. I was told that it was not them it was DOC. I was handcuffed and forced to take psyche-meds. My clothes were taken from me and I was given a paper gerney to wear. At this point, my feet was shackled and I was denied access to a mattress, pillow, covers, hygiene materials, shower, nor access to any legal materials. I remained there for two (2) weeks and then brought back to the Segregation Unit. It was at this point that I discovered the legal

research for the reconsideration missing. I told two doctors that the psyche-meds were making me hallucinate. On or about July 4, 2001, while back in the segregation unit, I was allowed to call Attorney Greenberg within which she was told about what had happened with me hallucinating, due to the medication. She told me to put what papers I had together and to send them in. I telephoned my parents and they voiced their concern about me hallucinating. My mother and older sister had drove up from B'ham, Alabama within two days. They talked with a social worker employed at the Walpole prison facility and spoke to them about their concern with the hallucinating. For weeks I wrote papers and attached exhibits in large volumes that really had nothing to do with Reconsideration. All of it was hallucinatory, unclear and the confusing handwritten papers, exhibits, resumes, law school papers, ect., were all sent to Judge Tierney and Attorney Greenberg by certified mail. I told Attorney Greenberg that DOC picked the time to conspired against and help the State prosecutor by talking me away from the law library, away from my attorney, away from my legal work, and typing help. And put me back on psyche-meds which were not Court-ordered after I got off of them in January 2001. DOC breached their duty of care, thereby, violating Civil, State and Federal Constitutional rights. I also told Attorney Greenberg that I sent $1500 to an address that, someone told me in the law library, was a private investigator. There were two different addresses so I did a stop payment notice within three (3) days. However, the Treasure's office in Walpole didn't process the stop payment on the $1500 check, which was cashed. But, Francis Hanon, another inmate did a stop payment within 3 days and the treasurer did a stop payment and re-deposited his $400 back into his account. Attorney Greenberg did not contact Judge Tierney nor informed him of these illegal conspiracies by DOC against me. She could have asked him in her Reconsideration to please reconsider his good faith promise to wait for me to hire help for my innocence. And that she and I relied on the judge's promise in good faith to wait for me. Attorney Greenberg was very ineffective because of not contacting nor informing Judge Tierney that I was forced to take psychological medications, absent a court order, causing hallucinations at the time I needed a clear mind to do my Reconsideration for him before June 30, 2001. And also the large volume of handwritten papers and exhibits sent to both her and judge Tierney was incoherent, unclear, untyped and hallucinatory. She said the Court could hold her responsible for sending my confused hallucinated handwritten papers to Judge Tierney. Attorney Greenberg could have contacted CPCS in order to help me. It is her oath and professional Code of Ethics to represent me fairly and help me legally at all times. She could have contacted the Massachusetts Attorney General to inform that office of conspiracies acts against me, thereby, rendering an obstruction of justice as well as violations of my Constitution rights. I filed a Civil law suit against DOC in the United States District Court-Civil Docket #1:03CV 121 38-RWZ, for these wrongs.

Judge Tierney was judicial misconduct when he received all these large volumes of hallucinatory handwritten pages and exhibits and did not inquire about these or keep his promise to wait for me as he told his Clerk he would do. And did not ask Mass. Attorney General to help clear up this problem.

I'm also filing legal malpractice against Attorney Segadelli. I

have already sent his demand letter.

Attorney Greenberg was very ineffective for not raising all my Constitutional rights violations in her Certiorari: right to a colloquy, right to testify, right to defense witnesses, right to legal investigation by trial counsel, right for court ordered and funded legal experts to test falsely made up evidence submitted by Commonwealth; police misconduct by court ordered funding for private investigations and many issues that were raised in both the Motion for New Trial and direct appeal including ineffective assistance of Attorney Segadelli.

Attorney Greenberg was very ineffective to raised a very unprofessional, unclear, confused issue in my Certiorari (please see page 3 above). This issue was "The right to Conduct one's own defense . . ." when she was my appellant Counsel and I was not raising my own defense I had her as my attorney. She asked me to stay out of this and she raise this issue on Certiorari on her own behalf. This was unethical and unprofessional and violated my Constitutional right to a fair trial and my right to an appellant attorney. The second part was that Judge Tierney should have did a colloquy on-the-record to determine that I made a knowing, intelligent and voluntary decision to testify.

I sent in to Attorney Greenberg two (2) issues that she promised would be included but were not. I sent these same issues to Jane Lewis, Clerk, S.J.C., but she contact Attorney Greenberg and said that I had to send these through Attorney Greenberg only. First issue is: dated November 15, 2000 according to Jean Felix she left the scene to obtain a phone call 911 TR3-35. Therefore she could have missed anyone existing 591 Middle Street. Second December 5, 2000 ineffective assistance of Counsel: Defense Counsel failed to investigate or raise the defense of another individual committing the crime. Although he knew that blood evidence collected from the defendant, toenail scraping indicated someone in addition to victim and defendant was at the crime scene." Appellant Counsel was ineffective for not including these issues, as were promised, in the New Trial Motion.

Attorney Greenberg was very ineffective when she refused to raised my Apprendi issue that I was not specifically indicted.

Attorney Greenberg was very ineffective when I asked her by letter to do a court order as requested by Jury Commissioner in response to my letters to him asking him the names of two (2) black jurors out of a pool of 86. I sent her a copy of the Jury Commissioner's letters and copies of my letters to him. Attorney Greenberg failed to do a court order to which would have obtained the much needed names of the only two black jurors.

Attorney Greenberg was very ineffective when she failed to raise the same issues I informed her that Attorney Segadelli did not object too on page 18 above. I ask Attorney Greenberg to raise Aponte, failure to challenge the integrity of the jury venire; failure to challenge the prosecutor's peremptory challenge of two (2) black jurors out of a pool of 86: Constitutional Magna Culpa, defendant was denied a Constitutional fair trial and created a substantial miscarriage of justice.

Attorney Greenberg was ineffective for refusing by letter to stay my direct appeal and re-do her reconsideration and informing Judge of the problem I was having with conspiracies by DOC. And she refused to do a 2nd Rule 30 Motion for a New Trial with private investigator and legal defense experts.