COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                                SUPERIOR COURT
Indictment No. 35042


COMMONWEALTH OF MASSACHUSETTS

vs.

RAYMOND COOK


BEFORE:  Honorable John A. Tierney.


EXCERPT OF TRIAL TRANSCRIPT


APPEARANCES:

    Ronald F. Moynahan, Assistant District Attorney,
Bristol District, 888 Purchase Street, New Bedford,
Massachusetts 02740, for the Commonwealth.

    J. Drew Segadelli, Esq., FAGAN, GOLDRICK &
SEGADELLI, 356 Main Street, Falmouth, Massachusetts
02540, for the Defendant.


                        New Bedford Superior Courthouse
                        New Bedford, Massachusetts
                        Wednesday, May 27, 1998


                    MARILYN SILVIA
                Official Court Reporter

1

```
 1              (Private conversation with Mr.
 2        Segadelli and Mr. Cook.)
 3    BY MR. SEGADELLI:
 4    Q.   Raymond, how are you doing?
 5    A.   All right.
 6    Q.   As I told you, we have concluded with the
 7         witnesses, all of the experts, as well as the
 8         other witnesses we have called.  I have told you
 9         at this time I am ready for the defense to rest
10         its case.  I told you, however, that is, it has
11         never been my decision and my decision alone.
12    A.   Yes, sir.
13    Q.   She's got to be able to hear you too.
14    A.   Yes, sir, I remember.
15    Q.   And as we discussed previously, the options
16         available to you are to either testify or not to
17         testify.  And that is why I have the court
18         reporter here to talk over your option with you,
19         and specifically, the question as to whether or
20         not you wish to testify?
21    A.   Yes, sir, I understand.
22    Q.   Okay.  Tell me what you understand.
23    A.   I understand that I have an option whether or not
24         not to testify, exactly what you just asked.
25    Q.   Okay.  And have I discussed with you what I
```

```
 1           believed my advice was as to whether or not you
 2           should testify?
 3    A.     Yes, sir, you did.
 4    Q.     And what was that advice?
 5    A.     You don't think I should.
 6    Q.     Okay.  But you do understand that is your option
 7           and it's not for me to say as to whether or not
 8           you're going to testify?
 9    A.     Yes, sir, I understand.
10    Q.     Do you understand that?
11    A.     Yes, sir.
12    Q.     Okay.  That is completely your decision.  Okay.
13           Can you say it audibly so she can hear you.
14    A.     It was completely my decision not to testify.
15    Q.     Is that your decision?  I don't want to push you
16           one way or the other, that's for you to do, free
17           things.
18    A.     I think the jury should know about the facts,
19           what happened on August 24, 1994.  And I'm ready
20           to testify.
21    Q.     Okay.  Do you understand why, what -- again, it
22           being your decision, though, what my advice is
23           about your testifying?
24    A.     Yes, sir, I understand.
25    Q.     Do you understand my advice is for you not to
```

3

1    testify, as to I believe it could seriously

2    impair our defense, it could hurt us.  Do you

3    understand that's my --

4  A.  Why do you think that, sir?

5  Q.  Well, because you're different than you were back

6    then.  Do you understand that?  That you're a

7    little bit different, that you have been taking

8    some medication, right?

9  A.  Yes, sir.

10  Q.  Now you're taking some?

11  A.  I was taking it then.

12  Q.  And that some of the things that the doctors were

13    saying about you caused us some concerns about

14    some of the things you were doing?

15  A.  Doctor Denton.

16  Q.  And did she report accurately what happened when

17    we met in that little side room in the court?

18  A.  There's a couple of things, and I explained this

19    to you before, the word "Excellency" came from

20    people talking in the park and the dog, they

21    would say these words often.  I thought it was

22    pretty good to say, call a person "Your

23    Excellency."

24  Q.  Did you at that time have a mental illness?

25  A.  I didn't say I did.

4

1    Q.   You did?

2    A.   Yes, sir.

3    Q.   When did you recognize that you have or had a

4         mental illness?

5    A.   When there's a difference, one is when I went to

6         Taunton, the charge was breaking and entering,

7         and I explained to you that my landlord had

8         opened the second floor door, I lived on the

9         third floor.

10   Q.   Let me interrupt.  I want to get you to Fall

11        River.  If you listen to my questions.  When did

12        you come to the understanding that you have a

13        major mental illness?

14   A.   When they told me at Taunton.

15   Q.   But do you understand that since the time, I have

16        been representing you since August of 25 of '94,

17        you have always said you do not have any mental

18        illness?

19   A.   No, sir.

20   Q.   Okay.  Is it now your memory and understanding

21        that you have always told those doctors, who all

22        testified, and everybody else, that you do in

23        fact have a mental illness?

24   A.   The only confusion is that I committed the crime

25        in Fall River, 129 Fifth Street.  And I did not

5

```
 1        commit the crime, the landlord opened his door
 2        for the breaking and entering.
 3   Q.   We're talking about mental illness.
 4   A.   I understand what you're saying.  That was one of
 5        the problems, that I committed the crime, and I
 6        explained to people that I did not commit the
 7        crime.
 8   Q.   Okay.  And do you understand that or were you
 9        suffering from any effects of the mental illness
10        on the day of the 24th of August?
11   A.   Yes, sir, I was.
12   Q.   What was some of your effects of that?
13   A.   Well, I took my medication that morning.  I was
14        clear, and I was quite busy, very busy doing
15        things, like cleaning up the apartment, redoing
16        my resume.
17   Q.   The story you told Siderwitz?
18   A.   Yes -- No.  Where he got it, too, was from my
19        papers that I had to send you and Attorney
20        Levine.
21   Q.   Okay.  What is your understanding of what the
22        jury might be thinking at this stage of the trial
23        as to whether or not you committed this crime?
24   A.   I don't know, sir, to get into the mind of the
25        jurors.
```

10

6

1   Q.  You have heard all of the evidence, haven't you?

2   A.  Yes.

3   Q.  What is your opinion?  You've got a formal

4       education, right?

5   A.  Yes.

6   Q.  And I always helped you?

7   A.  Yes, sir, yes.

8   Q.  What is your opinion as to the weight of the

9       evidence?  Do you know what I'm saying when I say

10      that?

11  A.  I don't know, sir, that's hard to say.  Hopefully

12      that they will understand I did not commit the

13      crime.

14  Q.  What evidence have you heard thus far throughout

15      this trial which suggests you did not commit this

16      crime and you should be found not guilty?

17  A.  I haven't really heard any evidence saying I did

18      commit the crime.  Prior expert testimony saying

19      that I had a mental illness.

20  Q.  What about the material about Jean Felix and her

21      reporting about you walking out with a gun, and

22      so forth?

23  A.  The police officer asked me to give the gun to

24      the police.

25  Q.  Right now I'm talking to you, Ray, I am not

102

7

1     talking to you about what your memory of the

2     events were, I'm talking to you about what the

3     members of the jury have heard.  Do you

4     understand that's what I'm trying to do?

5  A.  Yes, sir.

6  Q.  And that the jury has heard that Jean Felix and

7     her daughter see the officer come walking up the

8     street, walk up your stairs, knock on your door,

9     hearing you respond, hear you respond to the

10    door, a scuffle ensues, she hears a scuffle, they

11    hear these loud bangs which sound like gunshots,

12    they look up and see you over the officer.  Did

13    you hear the evidence that came in that sounded

14    like that?

15 A.  Yes, sir, but that's not what happened.  Remember

16    you and I was talking if they had the ability to

17    see in the house.

18 Q.  Did you hear the tape and what the girl was

19    saying as -- what Kelly was saying as she looked

20    up and said, He's holding the officer down.  Did

21    you hear that?

22 A.  Yes, sir, and they were nowhere near there.

23 Q.  No.  No.  I am asking you, did you hear that's

24    what these people up here heard, about the

25    evidence and the state of the evidence?

103

8

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What is your understanding of the defense we have |
| 3 | | put on for the last week? |
| 4 | A. | You said the strategy was not guilty or not |
| 5 | | guilty by reason of insanity. |
| 6 | Q. | That we would test and hold the Commonwealth to |
| 7 | | its burden of proving you guilty beyond a |
| 8 | | reasonable doubt. |
| 9 | A. | Yes. |
| 10 | Q. | Is that accurate? |
| 11 | A. | Yes, sir, it is. |
| 12 | Q. | And secondly, that we would put on evidence, if |
| 13 | | we were not allowed to have a bifurcated trial, |
| 14 | | that you were not guilty by reason of insanity, |
| 15 | | correct? |
| 16 | A. | Yes. |
| 17 | Q. | And we have put on a significant amount of |
| 18 | | evidence proving that you are not guilty by |
| 19 | | reason of insanity? |
| 20 | A. | Yes. |
| 21 | Q. | With Doctor Kelly from the district attorney's |
| 22 | | office, he was employed by them, you know that? |
| 23 | A. | Yes, sir. |
| 24 | Q. | Along with every doctor who has almost ever seen |
| 25 | | you and evaluated you? |

104

9

```
 1   A.   That's correct.  That's correct.
 2   Q.   And they have all testified that you appear to
 3        have been suffering from a major mental illness.
 4        Do you agree with that?
 5   A.   Yes, sir.
 6   Q.   And do you understand that it is the jury who has
 7        to determine -- excuse me -- it is the district
 8        attorney who has to prove beyond a reasonable
 9        doubt that you were sane at that time.  Do you
10        understand that concept?
11   A.   Yes, sir.
12   Q.   And what evidence do they have to show that you
13        were sane at that time?
14   A.   I don't see any.
15   Q.   You don't see any evidence?
16   A.   I don't see any evidence that they have I was
17        sane at that time.
18   Q.   You don't believe they had any evidence of your
19        sanity at that time?  If you don't understand
20        what I am asking you, please tell me.
21   A.   You're saying it's like the material that I sent
22        you about criminal responsibility, whether or not
23        I was sane at the time.  The state has the
24        responsibility of proving beyond a reasonable
25        doubt that I was sane at that time.
```

1    Q.   And that's their burden, you understand that?

2    A.   Yes, sir.

3    Q.   Now, I'm asking you, you have sat through this

4          whole trial, what evidence do they have, or they

5          have shown to the jury, to prove that burden to

6          satisfy the jury that you were sane at that time?

7    A.   That's kind of hard, sir. I thought most of the

8          expert testimony came from you.

9    Q.   Saying what?

10    A.   That I was not criminally responsible at the time

11         of the crime.

12    Q.   Okay. And the prosecution's job is to give

13         evidence as to the other position?

14    A.   Yes, sir, that's correct.

15    Q.   And you have heard all of the Kellys and Ebert

16         say that you were not criminally responsible?

17    A.   Yes, sir.

18    Q.   And you know it's their burden of proving this

19         beyond a reasonable doubt?

20    A.   Yes.

21    Q.   And I again ask you, if you can answer, maybe you

22         did not hear any. Did you hear any evidence that

23         satisfies the burden that you were sane at that

24         time, that you appreciated the wrongfulness of

25         your conduct, you could conform your behavior to

11

```
 1        the requirements of the law?  Did you hear any of
 2        that?
 3   A.   No.
 4   Q.   As the jury stands now, again, at almost the
 5        conclusion of our case, how does it appear to
 6        you?
 7   A.   I don't know, sir, that's hard.
 8   Q.   It's hard to judge or -- because we're not on the
 9        jury, but we have heard all of the evidence?
10   A.   Yes, sir.
11   Q.   Is it fair to say that they have probably proved
12        that you were the one who shot the gun?  They
13        have given a lot of evidence, Jean Felix, that
14        you were up in that hallway with the officer and
15        you walked out with the gun.
16   A.   No, sir, I don't think so.
17   Q.   You didn't hear that?
18   A.   No, sir.
19   Q.   Okay.  So?
20   A:   You mean when the officer told me to give the gun
21        to the police.
22   Q.   Again, I'm still just asking you what has
23        happened in this room we're sitting in now?
24   A.   Yes, we're at the prosecution.
25   Q.   Yes.  What the jury heard and where they are at
```

1      now.  Has the assistant district attorney given

2      any -- satisfied their burden that you were sane

3      at that time?  You understood what was going on?

4  A.  No, sir.

5  Q.  When did you finally find out that you had any

6      kind of mental illness?

7  A.  At Taunton.

8  Q.  When was Taunton?

9  A.  '93.

10 Q.  Since Taunton, anytime anyone ever asked you

11     whether or not you had a mental illness, how

12     would you respond?

13 A.  Yes, I do.

14 Q.  You admitted it?

15 A.  Yes.

16 Q.  You have heard all of the many doctors in this

17     trial indicate that you deny any mental illness?

18 A.  Yes, sir.

19 Q.  Were they all wrong?

20 A.  I don't know if they were all wrong.  I never

21     denied mental illness.

22 Q.  Did you ever deny taking your medication?

23 A.  No, sir, I haven't.

24 Q.  You have always taken your medication?  You heard

25     had postman, didn't you?

☒003  ATTORNEY GENERAL  01/27/2006 FRI 12:20 FAX 8175735356

13

```
 1   A.   Yes.
 2   Q.   Who were you receiving the medication from?
 3   A.   The VA Hospital in New Bedford.
 4   Q.   Okay.  And how were you obtaining those?
 5   A.   By mail.
 6   Q.   Okay.
 7   A.   And by me going there.
 8   Q.   And you heard the mailman testify as to seeing
 9        the closed package from the Veterans Home?
10   A.   The garbage can is behind a closed wall.
11   Q.   Did you hear the postman talk about your garbage
12        pail, in the trash can?
13   A.   Yes.
14   Q.   You think was that accurate?
15   A.   No, sir.
16   Q.   He was lying too?
17   A.   I didn't put any in the garbage cans.  I put the
18        garbage cans out every Thursday and they are
19        behind a closed wall.  What do you think about
20        this?
21   Q.   Raymond, I think -- what I think is, and you have
22        been following my advice for many years, the jury
23        has heard ample evidence that would satisfy the
24        Commonwealth's burden as to you being the one who
25        fired the gun.  Okay.  The Commonwealth has not
```

104

1        met its burden of the standard of not guilty by

2        reason of insanity.  They have to prove beyond a

3        reasonable doubt at that time that you

4        appreciated the wrongfulness of your conduct and

5        you could conform your behavior to the

6        requirements of the law, they have not given any

7        evidence from experts that can do that.

8              How else can they do that?  In the

9        cases, those cases say it, they can satisfy their

10       burden by other reporting witnesses, such as Jean

11       Felix, when you reported to her, "I'm not going

12       to shoot you, Jean," the jury could say, the jury

13       could say:  That guy knew what was right or wrong

14       and it was wrong to shoot Jean.  They can satisfy

15       their burden, and you're going to hear me do a

16       motion for required finding of not guilty, and

17       you know what that means?

18   A.  Yes.

19   Q.  And the judge will, I anticipate, will deny that

20       motion, he'll state the law as it exists in the

21       Commonwealth now, they can satisfy their burden

22       by lay witnesses.  These are some of the things

23       why I'm telling you, if you take the stand, and

24       as I have now told you three or four times, it

25       ultimately your decision.  However, my advice o

110

15

1    you is that you would really and truly hurt

2    yourself, Ray. Anytime somebody says something,

3    and you know I feel for you, and I have been with

4    you for a long time, anytime anybody says

5    anything about putting food in your hair, or

6    playing basketball by yourself without a ball,

7    some of those records --

8    A.  I never played basketball without a ball. I had

9        my own balls.

10   Q.  Or throwing medication in the garbage. You

11       considered them to be mistaken or you had a

12       different version of events. You would be up

13       there calling everybody who ever said you did

14       anything bizzare in this case either mistaken or

15       a liar. I don't think that's going to help you,

16       Ray. I don't think your version that day is

17       going to help you. I truly don't. Do you

18       understand my advice now?

19   A.  Yes, sir.

20   Q.  Let me ask you this, Ray. If you were to testify

21       and the district attorney were to put a lot of

22       notebooks in front you, and if this is troubling

23       you in any way, say you want to take a break or

24       something, if you were to put in one of those

25       notebooks, you know what's in those notebooks, if

16

1       he were to put those in front of you, how would
2       you interpret them?
3   A.  I had a little time from -- during my own
4       personal cases, I had lost a condo and the loan
5       was approved at the VA hearing, I started
6       thinking about God and started thinking about the
7       oh-play-oh-fray.
8   Q.  Could you spell that.
9   A.  Pig Latin we used to talk in the sixties.  I just
10      started thinking about God and "All Selves" and
11      just wrote it.
12  Q.  So those notebooks are Pig Latin, sort of like
13      that, what it is?
14  A.  It's not exactly Pig Latin, it's something that I
15      made that's similar to Pig Latin.
16  Q.  It was like your own language and vocabulary?
17  A.  Sort of like Pig Latin.
18  Q.  Did you understand one term where you say,
19      "Please help me," do you remember saying that?
20  A.  Yes, sir.
21  Q.  Okay.  And who is "All"?
22  A.  God.
23  Q.  And you attached God to almost all of the words?
24  A.  Everything.  To "Self," to his creation, to
25      everything.

17

```
 1    Q.   Okay.  But I don't want to get too far off, into
 2         some of our discussions because we are here, and
 3         this court reporter, she's given us her own
 4         time.  I just wanted to make a record for you,
 5         though you know it's ultimately your decision;
 6         however, it is my advice is that you not take the
 7         witness stand.  That a very competent and able
 8         district attorney, who would also get the
 9         opportunity to cross-examine you, get to look at
10         those notebooks, and some of the other things
11         that occurred, and I don't think -- in fact, I
12         know probably it would hurt your case.
13              Is there anything that confused you
14         about what my advice is?
15    A.   No, sir.
16    Q.   Okay.  And what do you want to do?  Are you
17         confused as to what is the best thing for you at
18         this time?
19    A.   Since you put it that way, I don't want it to
20         hurt my case.
21    Q.   That's my opinion.  I probably know your case
22         better than anyone.  It's just so you know, that
23         it's your decision but your decisions are made
24         per advice.
25    A.   I wish I could talk to my parents.  They were
```

117

18

1    here earlier and they're not here now.

2    Q.   To help you to be more -- to understand more, do

3         you have any other questions for me?

4              Let me ask you this.  You told us you

5         do now believe you have a mental illness and

6         you're suffering from it as you sit here today?

7    A.   No, sir.

8    Q.   So you told me you have been recognizing you have

9         a mental illness, you don't have one now?

10   A.   Do I suffer from it?  Am I going through any

11        changes?

12   Q.   Do you have a mental illness as you sit here?

13   A.   Yes, sir.

14   Q.   What is it?

15   A.   Schizophrenia.

16   Q.   Who told you that?

17   A.   Doctors.

18   Q.   Do you believe the doctors?

19   A.   Yes.

20   Q.   Do you believe that you, suffering from the

21        effects and symptoms of schizophrenia, would help

22        or hurt you if you attempted to take the witness

23        stand?

24   A.   I don't know, sir.  What do you think?

25   Q.   I told what I think and what my advice is.  I

116

19

1       want you to know freely and voluntarily it's your
2       choice.
3   A.  Attorney Segadelli, I have been trying to from
4       the first, beginning of this whole ordeal, I have
5       been in a situation where I have never been in
6       anything like this before, and I'm innocent, and
7       it's not because of my mental illness, I was
8       there, and I say what happened.  I can't say to
9       you that I am not innocent, I can only say what
10      happened, if you don't want to believe that.
11  Q.  Let me stop you there.  What I believe doesn't
12      amount to a hill of beans or doesn't amount to
13      anything.
14  A.  Remember you said that some people saw Jean Felix
15      pull up later?
16  Q.  I believe there was a witness that said she was
17      pulling up in her car.  It turned out that
18      witness saw her just getting out of the car, as
19      many witness said, she did remain right in front
20      of the home.
21  A.  The car was down the street, she wasn't in front
22      of the home.
23  Q.  You heard her testify to that?
24  A.  Regardless of what?
25  Q.  What you remember.  There was some testimony

115

20

```
 1        about that.
 2                Do you have any other questions for me?
 3   A.   No, sir.
 4   Q.   Okay.  And what do you want to do?
 5   A.   I would like to speak to my parents if I could.
 6   Q.   Do you think there's a telephone number you could
 7        reach them at?
 8   A.   That would have to be the PIN number.
 9   Q.   A PIN number is when you charge a telephone
10        call.  Do you know the telephone number they
11        could reach you at?  You're not going to be able
12        to speak to them today.
13   A.   Okay.
14   Q.   What type of inquiry, what do you want to learn
15        or hear from your parents that could maybe help
16        you, just so maybe I can help you some more.
17   A.   I mean, I don't know what to do.  I understand
18        what you're saying, I agree with you, and I just
19        don't know what to do.  I don't know whether to
20        get on the witness stand and say what happened,
21        or what to do.
22   Q.   You're confused?
23   A.   Kind of confused.
24   Q.   When you have been confused, or since the time
25        you have known me, and when you were confused,
```

116

21

1    did you generally follow my advice?

2  A. Yes, sir, I did.

3  Q. We're at that one part in this case, really, that

4     I can give you my advice, and my strong advice

5     which is for you not to testify; that's my strong

6     advice.  But, again, I can preface it, being my

7     strong advice, I can't say, Raymond, you can't go

8     up there, because that's your right.  I can just

9     give you my advice after explaining to you the

10    situation.  I think I have explained to you the

11    state of the case, Raymond.  They haven't given

12    any testimony about your sanity at that time

13    other than a few civilians saying you spoke

14    appropriately, and so forth.  If you get up and

15    tell them, for instance, that the people who

16    thought you were feeding your hair and putting

17    cheese in it were mistaken.

18  A. They were not mistaken.  I got this from -- about

19    dreadlocks, that's how I make it a certain

20    texture.

21  Q. By doing what?

22  A. By putting certain kinds of food and make it a

23    certain texture and certain color.

24  Q. Do you understand that the evidence the doctors

25    proposed about Cheese Whiz and other food in your

117

```
 1        hair lends further credibility to your having a
 2        severe major mental illness and schizophrenia,
 3        and for you to, just on that small little point,
 4        disclaiming, trying to explain away why you were
 5        putting food in your hair as not being part of
 6        your mental illness, hurts your case.  Do you
 7        understand that?
 8   A.   Yes, sir, I do.
 9   Q.   For you to get up and simply try to explain away
10        the significance of your having put food in your
11        hair, having lined up trash cans like soldiers or
12        having named your food or named your son Solomon,
13        for you to have your own explanation of that,
14        hurts, in my view, your case significantly, or it
15        could in the jurors' eyes.  That is why my advice
16        is that you do not take the stand, that's part of
17        the reason.
18   A.   So what are we going for, not guilty by reason of
19        insanity?
20   Q.   As I said in the beginning I wanted to hold off,
21        I wasn't going to concede anything that you did
22        this, I was going to -- and I still am, holding
23        the Commonwealth to their burden of proving you
24        guilty beyond a reasonable doubt.  I'm holding
25        them to that, that's their job, and they are
```

119

23

```
 1        going to be held to that job.  Part of their job,
 2        likewise, is to prove you were sane at that
 3        time.  The standard Doctor Kelly put, you know,
 4        on the board there.  I'm holding to that
 5        standard.  I'm telling you at this time the
 6        weight of the evidence lends itself that they
 7        have met their burden, their first burden, that
 8        you may have been responsible.
 9   A.   May have been responsible?
10   Q.   Probably were.  Since we don't have those, either
11        the couple of black men or Portuguese or three
12        fellows running out of there.  They inspected the
13        upstairs apartment, they inspected your
14        apartment, that there were numerous people out in
15        the field.
16   A.   It took them quite a while to even get --
17   Q.   They inspected your apartment, the whole field,
18        and nobody left that apartment, Ray.  The
19        evidence is lending itself to them having met
20        their first burden of proof.
21   A.   Mr. Raymond Boulay said people were running.
22   Q.   People were running getting kids out out of there
23        because they heard gunshots.  He didn't say there
24        were people running out of your apartment because
25        there are three -- you have Sidorwitz's story,
```

114

24

```
1        whether or not he's that convict looking to do
2        himself a good turn by creating this whole story,
3        he said some pretty strong things, "justifiable
4        homicide," he attributed these to you, that you
5        had said to him, if you were offered manslaughter
6        or justifiable homicide, you would come up with
7        the story you saw the gun and you came out and
8        you grabbed it and shot him.  Those are the
9        things that this guy is very skilful at, as I
10       told you, and he would go after you for those.
11   A.  Even though they are not true?
12   A.  Even though they are not true.
13   Q.  He would go after you, Ray, and these are, again,
14       more things.  We're doing even a longer record of
15       why I think you would only hurt yourself by
16       testifying, why I think the Commonwealth has
17       perhaps, due to the weight of the evidence, met
18       that burden of proving, proving you responsible.
19       So we have got to stay with that Ray, the NGRI,
20       we have got to stay with that.  We have got to be
21       hammering at it.  For you to diminish some of
22       these things, diminish some of the unusual things
23       that have been testified to, only hurts you,
24       Ray.
25   A.  What do you mean?
```

120

25

1   Q.  Let me ask you about -- you heard Jean Felix
2       about you having the oven on full blast?
3   A.  I was cleaning the oven.
4   Q.  Was it a hot day?
5   A.  It was pretty -- it was okay.
6   Q.  So you're having the oven on when it was 85
7       degrees, on high with the door open, so your
8       apartment was 100 degrees, was not a product of
9       your mental illness because you were cleaning the
10      damn oven?
11  A.  With the oven on.
12  Q.  Ray, I don't think that's true.  I know that's
13      what you understand as being true, Ray, but
14      you're explaining away some type of kind of
15      bizzare behavior which I think assists our case
16      for NGRI.  What you're doing, we have got a lot
17      of weight going towards NGRI, and you want to
18      diminish that and help the Commonwealth out,
19      that's what I think you would do by testifying.
20  A.  May I ask you?
21  Q.  You can ask me all day if you want.
22  A.  Sir, I would like to talk to my parents because
23      they -- I mean, I don't disagree with you.
24  Q.  Yeah.  Okay.
25  A.  And all four of us can sit down and talk.

26

1    Q.  I don't know if we're going to have the
2        opportunity to do that.  I will report that to
3        the judge.
4                  Have you talked to your parents about
5        you testifying?
6    A.  They said I should go on the stand.
7    Q.  Do you understand your mother is getting pretty
8        old?
9    A.  Yes, sir, I do.
10   Q.  And because of my concerns for her age, and so
11       forth, even after putting her on the witness
12       list, I did not put her on the witness stand,
13       okay?
14   A.  Yes, sir.
15   Q.  And that her understanding of some of the events
16       of that time wouldn't really assist you either,
17       Ray.  She lessens the severity of your major
18       mentally illness, she does, and she wouldn't help
19       us, and that's why I made the decision not to put
20       her on the stand because she would not help us.
21       Okay?  I thought she would hurt us.
22   A.  That's one thing I would like for you to know, I
23       am saying this to you as my attorney, that I did
24       not commit the crime.  I want you to know from
25       that moment on, until the present day, and what I

122

27

```
 1        said to Mr. Sidorwitz when I caught him reading

 2        my papers, I asked him not to read those papers

 3        that I was sending to you and Attorney Levine.  I

 4        can't do no more but tell the truth about this

 5        whole situation.

 6   Q.   What about your having told him about justifiable

 7        homicide?

 8   A.   That was his idea, he said that, You have

 9        never -- I read your resume.  "One, you said you

10        didn't have a resume, I made up my own resume."

11        He read up all that material I sent you and

12        Attorney Levine.  "You never had any court

13        experience before and you've never been

14        incarcerated before except at Taunton, you don't

15        have any plea bargaining experience like I do.

16        You should take time, sir, and plead time served,

17        and plead involuntary manslaughter."  These were

18        his sayings in front of everybody while we were

19        sitting there.  I said I don't want to do that.

20        I have to consult with my attorney.  All these

21        people knew and they are trying to send you

22        affidavits.  I can't go there and stop

23        Mr. Sidorwitz; and he doesn't like attorneys.

24   Q.   Of course you can't.

25   A.   I can only give you facts.  What happened at the
```

123

28

1      apartment, that these people were in the hallway
2      arguing with this police officer who -- I don't
3      know how it started, I was asleep.
4   Q. Now, I am not getting into your version.  I have
5      heard it so many times.  I also heard, Ray, from
6      you for four years now that you don't suffer from
7      any problems.
8   A. That's not true.
9   Q. You really don't?  That's what you have been
10     telling me for a long, long time.
11  A. What I was trying to explain to you, that I kept
12     trying to say was about Taunton.
13  Q. I just mean, every time we've spoke on the phone
14     and by letter and everything, you have always
15     denied having any problems.
16  A. I have a mental illness.
17  Q. You say that now.
18  A. I always said that.
19  Q. How does that mental illness, how does it come
20     out, what if anything do you do?
21  A. Communication problems.
22  Q. How do you communicate improperly?
23  A. I don't talk enough.
24  Q. Your mental illness comes out by you not talking
25     enough.  How else?  Is that notebook a sign of

124

29

```
 1        your mental illness as Doctor Ebert testified?

 2   A.   That's what he said.

 3   Q.   I'm asking you, Ray.

 4   A.   I explained to you what happened.

 5   Q.   Is that an example of your mental illness?

 6   A.   I think so.

 7   Q.   Are you telling me that, am I convincing --

 8   A.   You never asked about that notebook, you asked my

 9        parents about it.

10   Q.   Is that an example maybe your mental illness was

11        coming out and portraying itself?

12   A.   Yes, sir, I think so.

13   Q.   How about your mumbling or talking or arguing

14        with yourself?

15   A.   I don't do that.  I sing a lot.

16   Q.   You never did that?

17   A.   I'm talking to people, I have a soft voice, and

18        with my son, if -- no matter what I say to you is

19        not going to make any difference because of what

20        you said.  I understand that.

21   Q.   I want you to be able to see, I want you to -- I

22        don't want people convincing you of things like

23        you have been convinced of mental illness when I

24        never thought you had one.

25   A.   Only thing I want to do is speak with my parents
```

125

1           when I make this decision.

2    Q.    We are going to have to let you do that.

3    A.    With you being here.

4    Q.    Perhaps they could get here at 8:30.  Let me

5           report this to the judge.  Do you have any

6           questions for me.

7    A.    No.

8    Q.    Okay.

9                     (Conference concluded.)

10

11

12

13                         CERTIFICATE

14                I, Marilyn J. Silvia, Official Court

15          Reporter, do hereby certify that the foregoing

16          record, Pages 1 through 30, is a complete,

17          accurate, and true transcription of my

18          stenographic notes taken in the aforementioned

19          matter to the best of my skills and ability.

20

21

22

23                                _Marilyn Silvea_
                              MARILYN J. SILVIA
24                            Official Court Reporter

25

                              12Y